JOELLEN MASON, Plaintiff v. IRENE DWINNELL, Defendant

No. COA07-176

(Filed 6 May 2008)

## 1. Appeal and Error— notice of appeal—prior order

There was no appellate jurisdiction to review a trial court order from 24 July 2006 when the sole notice of appeal was from a 1 June 2006 order in the same case. The notice of appeal was filed before the 24 July order, and so could not have referred to that order, and another notice of appeal was required.

## 2. Child Support, Custody, and Visitation— custody—same sex parents—best interest of child standard

In a child custody case involving same sex domestic partners, the question was whether the birth parent had acted inconsistently with her paramount parental right, making the applicable standard the best interest of the child. The nature of the relationship is of no legal significance to custody and visitation, and the question of whether a domestic partner may acquire the status of a parent is not presented here.

## 3. Child Support, Custody, and Visitation— custody—standing—same sex partner

The trial court properly concluded that a nonbiological same-sex domestic partner had standing to pursue custody of a minor child. The relationship between the third party and the child is the relevant consideration; here, there were unchallenged findings that established that the nonbiological partner had a relationship with the child in the nature of a parent-child relationship.

## 4. Child Support, Custody, and Visitation— custody—same sex parents—exclusive parental authority shared with partner—best interest of child standard

A same-sex partner who was the biological parent of a child gave up her right to unilaterally exclude her partner (or limit contact with the child) by choosing to cede to her a sufficiently significant amount of parental responsibility and decision-making authority, creating a permanent parent-like relationship. The domestic partner is not entitled to the rights of a legal parent, but the trial court may apply the best interest of the child test in considering a request for custody and visitation.

**5. Child Support, Custody, and Visitation— conduct inconsistent with exclusive parental role—involving another person—nature of conduct**

When examining a legal parent's conduct to determine whether it is inconsistent with his or her constitutionally-protected status, the focus is on volitional acts of the legal parent that relinquish otherwise exclusive parental authority to a third party, not whether the conduct consists of "good acts" or "bad acts." However, the conduct by the same-sex parent in this case (encouraging the child to develop a parent-child bond with her partner with the expectation that it would continue and then severing the relationship) cannot be viewed as benign. The proper standard for determining custody, then, was "the best interest of the child."

**6. Child Support, Custody, and Visitation— joint custody— same sex parents**

The trial court did not err by granting joint custody to same-sex parties on the "best interest of the child" standard. The court made sufficient findings about the bond between the child and the nonbiological partner and defendant, the biological parent, did not argue that these findings were unsupported by evidence. The mere fact that contrary evidence exists does not justify reversal.

Appeal by defendant from order entered 1 June 2006 by Judge Ann McKown in Durham County District Court. Heard in the Court of Appeals 11 October 2007.

*Gabriela J. Matthews & Associates, P.A., by Gabriela J. Matthews; and Tharrington Smith, L.L.P., by Jill Schnabel Jackson, for plaintiff-appellee.*

*Darsie, Sharpe, Mackritis & Dukelow, P.L.L.C., by Lisa M. Dukelow and Jaye Meyer, for defendant-appellant.*

*Blan V. Minton; Latham & Watkins LLP, by Robyn L. Ginsberg and Kendall C. Burman; and Center on Children and Families, by Barbara Bennett Woodhouse, for amici curiae National Association of Social Workers and National Association of Social Workers, North Carolina Chapter.*

*Professor Suzanne Reynolds for amicus curiae North Carolina Association of Women Attorneys.*

**MASON v. DWINNELL**

[190 N.C. App. 209 (2008)]

GEER, Judge.

Defendant Irene Dwinnell appeals from the trial court's order awarding permanent joint legal and physical custody of her minor child to Dwinnell and her former domestic partner, plaintiff Joellen Mason. It is important to first observe that the factual context of this case—involving same sex domestic partners—is immaterial to the proper analysis of the legal issues involved. The fundamental question presented by this appeal is whether the district court's findings of fact are sufficient to support its conclusion of law that it should apply the "best interest of the child" standard in determining whether Mason—who is not a legal parent[1] of the child—should be awarded custody of the child, including visitation. We hold that the trial court properly applied the controlling authority of *Price v. Howard*, 346 N.C. 68, 484 S.E.2d 528 (1997), and, accordingly, we affirm the trial court's order.

## Facts and Procedural History

The district court made the following pertinent findings of fact. Mason and Dwinnell were domestic partners for eight years. At some point during that relationship, Dwinnell learned that, for medical reasons, she would need to pursue a pregnancy at that time if she wanted biological children. Although Mason had no plans to bear a biological child, she wanted to have a family with Dwinnell. Subsequently, on 25 November 1995, Mason and Dwinnell held a commitment ceremony attended by their families and friends.

Mason and Dwinnell together researched and discussed their options for conceiving a child, including use of an anonymous or known donor and the various sperm donation programs available. Ultimately, they mutually chose an anonymous sperm donor who had physical characteristics resembling those of Mason. Dwinnell and Mason together attended all of Dwinnell's inseminations and, after she became pregnant, all of her prenatal care appointments, sessions at the hospital, and childbirth classes. They also planned and prepared the child's nursery together.

A birth plan was developed that included Mason's participating in the birth of the child. Mason in fact attended the child's birth on 11 January 1997 and cut his umbilical cord. Combining their surnames, Dwinnell and Mason named the child Mason Dwinnell. Although

---

1. We use the phrase "legal parent" to reference both biological and adoptive parents.

Dwinnell's name was the only name listed as a parent on the child's birth certificate, evidence was presented that the parties mutually desired to include both Mason and Dwinnell on the birth certificate, but the hospital refused to do so.

Dwinnell and Mason discussed and agreed upon the godparents of the child. They held a baptismal ceremony for the child at which they publicly presented themselves to family and friends as the child's two parents. The women explained how they derived the child's name by combining their last names, and both Mason's parents and Dwinnell's parents were recognized as the child's grandparents.

Dwinnell has stipulated that following the child's birth, "he lived with both parties who were acting as a family unit." Dwinnell and Mason shared caretaking responsibilities for the child with Mason normally caring for him during weekday mornings. Although the women shared paying household expenses and the child's individual expenses, Dwinnell and Mason agreed that Mason would claim the child as a dependent for all income tax purposes.

On 22 March 2000, when the child was three years old, Dwinnell and Mason signed before a notary public a "Parenting Agreement" prepared by an attorney. Each woman had received a draft and had an opportunity to review it prior to signing it. According to the district court, Dwinnell and Mason both wished to enter into an agreement that gave Mason all of the rights and responsibilities of an equal parent.

The document recited that (1) each party acknowledged and agreed that "they jointly decided to conceive and bear a child, based upon their commitment to each other and their commitment to jointly parent a child;" (2) Mason "would legally adopt this child, with the consent and joinder of [Dwinnell], if the laws of the State of North Carolina allowed for second parent adoptions, which they currently do not;" (3) each party acknowledged and agreed that "although [Mason] is not the biological mother, she is a *de facto* parent who has and will provide the parties' child with a stable environment and she has formed a psychological parenting relationship with the parties' child;" (4) "each party further acknowledges and agrees that their child's relationship with [Mason] should be protected and promoted to preserve the strong emotional ties that exist between them;" and (5) "the parties desire to make provisions regarding the support, custody and care of their child in the event that they should cease living together as a family . . . ." The document then set forth provisions

relating to Mason's custody, visitation, and financial support should the women's relationship terminate, as well as other provisions addressing what would happen if Dwinnell was unable to care for the child. The document specifically stated: "Each party acknowledges and agrees that all major decisions regarding their child, including, but not limited to, residence, support, education, religious upbringing and medical care shall be made jointly by the parties and that their child shall be involved in the decision-making to the extent he is able, by maturity, to do so."

Also in 2000, Dwinnell executed a minor health care power of attorney authorizing Mason to obtain medical care for the child. Mason would take the child to the doctor if he needed medical attention while she was caring for him. Mason also went with Dwinnell to the majority of the child's annual pediatric appointments.

Consistent with the Parenting Agreement, Dwinnell and Mason discussed the child's education and mutually agreed for him to attend private school at Carolina Friends School. Both Dwinnell and Mason attended parent-teacher conferences for the child. In addition, until this litigation, Dwinnell and Mason discussed and mutually agreed upon all of the child's extracurricular activities.

Dwinnell has stipulated that Mason paid the majority of daycare and preschool expenses; all of the child's school tuition for four years and one semester, with a fifth year's tuition paid by a trust funded by Mason's parents; and all of the child's before- and after-care from 2000 through June 2004. Dwinnell has further stipulated that Mason's parents established an irrevocable trust for the minor child, as they had for all of their grandchildren, with Dwinnell and Mason executing documents in which they agreed to serve as co-trustees. Mason established a college savings account for the child funded by Mason and her parents.

When completing forms relating to the child, Dwinnell marked through "Husband," "Father," or "Guardian" and inserted "co-parent," followed by Mason's name. Such forms admitted at trial included the application for enrollment at Carolina Friends School and a contract with the school completed by Dwinnell and Mason jointly, as well as a consent form signed by both Dwinnell and Mason for the child to have therapeutic intervention at Developmental Therapy Associates. In addition, in 2001, Dwinnell executed a will designating Mason as the child's guardian if she died.

MASON v. DWINNELL

[190 N.C. App. 209 (2008)]

In May 2001, Dwinnell and Mason decided to cease living together, and, in September 2001, Mason moved one block away. From that date until 2004, Dwinnell and Mason exercised parental responsibilities for the child in their respective homes, including overnight stays. Dwinnell has stipulated that on most mornings from October 2001 through much of 2003, after the child had spent the night with her, she would drop the child off at Mason's house, and Mason would take the child to daycare.

Although the parties did not at first have a set custody schedule, beginning in early 2003, Dwinnell would have the child for two days, followed by two days with Mason, with the parties alternating weekends. In early 2004, however, Dwinnell changed the schedule, and Mason consulted an attorney. Following a mediation, the parties agreed to have the child see a child therapist. When the therapist discussed custodial schedules with the child, despite Dwinnell's notifying him that he should not do so, the child was no longer sent to see that therapist. Beginning in October 2004, Dwinnell would only allow her child to visit Mason every other weekend and one evening each week for dinner. Dwinnell also removed Mason's name from the school pick-up list.

On 18 October 2004, Mason filed a complaint for custody. Dwinnell moved to dismiss the complaint, but the district court denied the motion on 20 December 2004. On 21 January 2005, the trial court granted the parties temporary joint legal and physical custody of the child, specifying that the child would spend equal time with each party. Following a 10-day hearing, the district court entered an order of permanent custody on 1 June 2006.

In the permanent custody order, the district court found, in addition to the findings recited above, that Dwinnell "encouraged, fostered, and facilitated the emotional and psychological bond between the minor child and [Mason]." Further, "[t]hroughout the child's life, [Mason] has provided care for him, financially supported him, and been an integral part of his life such that the child has benefited from her love and affection, caretaking, emotional and financial support, guidance, and decision-making."

Based on its findings of fact, the district court concluded first that Mason had standing to file a custody action. The court then concluded that "[b]y allowing [Mason] to be involved in the minor[] child['s] life as set forth above in the findings of fact and voluntarily executing a Parenting Agreement to share parental rights and respon-

sibilities, [Dwinnell] has acted inconsistent with her paramount parental right . . . ." As a result, the court concluded that it should determine the custody issues based on the child's best interests. Alternatively, the court concluded that Mason "is a parent by estoppel, given [Dwinnell's] conduct in establishing [Mason] as a parent to the child from preconception through 2004. Therefore, [Dwinnell] is now estopped from alleging that [Mason] is not a parent." Finally, the court concluded, based on findings of fact additional to those summarized above, that it was in the best interest of the child that the parties be granted permanent joint legal and physical custody of the child. The decretal portion of the order set forth detailed provisions regarding the operation of the joint legal and physical custody.

On 21 June 2006, Dwinnell filed a notice of appeal from the 1 June 2006 order. On 24 July 2006, the court entered an order amending its 1 June 2006 permanent custody order to correct "a clerical error in the facts and conclusions." The court amended one finding of fact and one conclusion of law to add that it was making its findings "by clear, cogent and convincing evidence." The order noted that the court had articulated the proper standard "on the record on several occasions, but inadvertently omitted it from its Order."

### 24 July 2006 Order

[1] As an initial matter, we address Dwinnell's assignment of error arguing that the trial court improperly entered its 24 July 2006 order amending its 1 June 2006 permanent custody order after Dwinnell had already filed a notice of appeal. We first note that the record on appeal contains no notice of appeal from the 24 July order. The sole notice of appeal included in the record on appeal references only the 1 June 2006 order.

Rule 3(d) of the North Carolina Rules of Appellate Procedure requires that the notice of appeal filed by the appellant "designate the judgment or order from which appeal is taken . . . ." In this case, since the notice of appeal was filed prior to the entry of the 24 July 2006 order, it could not reference that subsequent order. Dwinnell was, therefore, required to file another notice of appeal regarding that order. *See, e.g., In re Hudson*, 165 N.C. App. 894, 898, 600 S.E.2d 25, 28 (notice of appeal from decision on the merits of case did not provide appellate jurisdiction of subsequent order imposing Rule 11 sanctions when order not mentioned in notice of appeal), *appeal dismissed, disc. review denied, and cert. denied*, 359 N.C. 189, 607 S.E.2d 271 (2004); *Finley Forest Condo. Ass'n v. Perry*, 163

N.C. App. 735, 741, 594 S.E.2d 227, 231 (2004) (although plaintiff filed notice of appeal referencing underlying judgment, plaintiff "failed to file notice of appeal from the trial court's order permitting costs to be taxed against plaintiff; therefore, this Court is without jurisdiction to consider this issue"); *Chee v. Estes*, 117 N.C. App. 450, 452, 451 S.E.2d 349, 351 (1994) ("Plaintiffs' notice of appeal indicates that an appeal was being taken from the judgment entered in accordance with the verdict and it cannot be fairly inferred from the notice that plaintiffs intended as well to appeal the denial of their motion for new trial.").

"Without proper notice of appeal, the appellate court acquires no jurisdiction and neither the court nor the parties may waive the jurisdictional requirements even for good cause shown under Rule 2." *Bromhal v. Stott*, 116 N.C. App. 250, 253, 447 S.E.2d 481, 483 (1994), *disc. review denied in part*, 339 N.C. 609, 454 S.E.2d 246, *aff'd in part*, 341 N.C. 702, 462 S.E.2d 219 (1995). We, therefore, have no jurisdiction to review the 24 July 2006 order.

## Statutory and Constitutional Framework

[2] With respect to the merits, Dwinnell argues strenuously that we should defer to the legislature and allow it to decide whether the circumstances of this case warrant application of the "best interest of the child" standard. The legislature has, however, already spoken. In N.C. Gen. Stat. § 50-13.2(a) (2007), the General Assembly provided: "An order for custody of a minor child entered pursuant to this section shall award the custody of such child to such person, agency, organization or institution as will best promote the interest and welfare of the child." In other words, the General Assembly has determined that it is the public policy of this State that the "best interest of the child" standard shall apply whenever custody is sought regardless of the relationship of the recipient of custody to the child. *See Price*, 346 N.C. at 81, 484 S.E.2d at 535 (observing that, in North Carolina, statutes require courts "to base custody decisions solely upon the best interest of the child").

Rather than a question of legislative intent or State public policy, this appeal primarily presents a question of constitutional law. As our Supreme Court stated in *Price*: "The question now before us is whether, under the facts of this case, the trial court was required to hold that defendant's constitutionally protected interest in the companionship, custody, care, and control of her child must prevail or whether the statutorily prescribed 'best interest of the child'

test should have been applied to determine custody." *Id.* at 74, 484 S.E.2d at 531.

"It has long been understood that it is the duty of the courts to determine the meaning of the requirements of our Constitution." *Leandro v. State*, 346 N.C. 336, 345, 488 S.E.2d 249, 253 (1997). Thus, it is our responsibility to determine under what circumstances the federal and state constitutions override the General Assembly's determination that "the best interest of the child" standard should apply in all custody determinations.

In *Petersen v. Rogers*, 337 N.C. 397, 445 S.E.2d 901 (1994), our Supreme Court first addressed the impact of *Stanley v. Illinois*, 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972), on custody determinations in North Carolina. The Court noted *Stanley's* holding, based on the Due Process Clause, that " '[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' " 337 N.C. at 400-01, 445 S.E.2d at 903 (emphasis omitted) (quoting *Stanley*, 405 U.S. at 651, 31 L. Ed. 2d at 559, 92 S. Ct. at 1213). Based on this principle, the Court held "that absent a finding that parents (i) are unfit or (ii) have neglected the welfare of their children, the constitutionally-protected paramount right of parents to custody, care, and control of their children must prevail." *Id.* at 403-04, 445 S.E.2d at 905. Because the trial court in that case had made no finding that the natural parents were unfit or had neglected their child's welfare, the trial court "could not award custody to anyone other than [the parents]." *Id.* at 404, 445 S.E.2d at 905.

Our Supreme Court revisited legal parents' constitutional rights in *Price*. The Court noted that "[i]t was unnecessary in *Petersen* to articulate anything more than general constitutional principles." *Price*, 346 N.C. at 73, 484 S.E.2d at 531. The Court explained that "[i]n *Petersen*, this Court held that natural parents have a constitutionally protected interest in the companionship, custody, care, and control of their children" and that "this interest must prevail in a custody dispute with a nonparent, absent a showing of unfitness or neglect." *Id.* at 72, 484 S.E.2d at 530. *Price*, however, addressed "whether other circumstances can require that interest to yield to the 'best interest of the child' test prescribed by N.C.G.S. § 50-13.2(a)." *Id.*

The Court began its discussion of those "other circumstances" by noting that "[a] natural parent's constitutionally protected paramount

interest in the companionship, custody, care, and control of his or her child is a counterpart of the parental responsibilities the parent has assumed and is based on a presumption that he or she will act in the best interest of the child." *Id.* at 79, 484 S.E.2d at 534 (citing *Lehr v. Robertson*, 463 U.S. 248, 77 L. Ed. 2d 614, 103 S. Ct. 2985 (1983)). Based on this principle, the Court articulated the following test:

> [T]he parent may no longer enjoy a paramount status if his or her conduct is inconsistent with this presumption or if he or she fails to shoulder the responsibilities that are attendant to rearing a child. If a natural parent's conduct has not been inconsistent with his or her constitutionally protected status, application of the "best interest of the child" standard in a custody dispute with a nonparent would offend the Due Process Clause.

*Id.*

The Court declined to specify the universe of conduct that would "constitute conduct inconsistent with the protected status parents may enjoy," but rather directed that a parent's conduct "be viewed on a case-by-case basis." *Id.* Where a trial court finds conduct inconsistent with the parent's constitutionally-protected status, "custody should be determined by the 'best interest of the child' test mandated by statute." *Id.*, 484 S.E.2d at 535. Subsequently, the Supreme Court clarified that "a trial court's determination that a parent's conduct is inconsistent with his or her constitutionally protected status must be supported by clear and convincing evidence." *Adams v. Tessener*, 354 N.C. 57, 63, 550 S.E.2d 499, 503 (2001).

As in *Price*, we are, therefore, required to consider whether the trial court's findings, to the extent based on clear and convincing evidence, support its conclusion of law that Dwinnell "has acted inconsistent with her paramount parental right," making the "best interest of the child" standard applicable. In doing so, we must follow the Supreme Court's mandate that "[s]uch conduct would, of course, need to be viewed on a case-by-case basis . . . ." *Price*, 346 N.C. at 83, 484 S.E.2d at 537.

We note that because this case involves questions of custody only, it does not present the issue whether a former domestic partner may acquire the status of a legal parent. Therefore, we decline to address the doctrine of parent by estoppel adopted in other jurisdictions.

Likewise, we find immaterial Dwinnell's arguments that she and Mason could not marry, and Mason could not adopt the child under

North Carolina law. We cannot improve on the Pennsylvania Supreme Court's explanation as to why "the nature of the relationship" has no legal significance to the issues of custody and visitation: "The ability to marry the biological parent and the ability to adopt the subject child have never been and are not now factors in determining whether the third party assumed a parental status and discharged parental duties. *What is relevant, however, is the method by which the third party gained authority to do so.*" *T.B. v. L.R.M.*, 567 Pa. 222, 232, 786 A.2d 913, 918-19 (2001) (emphasis added).

### Standing

**[3]** Before turning to the constitutional question, we first address Dwinnell's related argument that Mason lacked standing to bring a custody action and that the trial court, therefore, erred in denying her motion to dismiss.[2] Standing in custody disputes is governed by N.C. Gen. Stat. § 50-13.1(a) (2007), which states that "[a]ny parent, relative, or *other person,* agency, organization or institution claiming the right to custody of a minor child may institute an action or proceeding for the custody of such child . . . ." N.C. Gen. Stat. § 50-13.1(a) (emphasis added). Nevertheless, as with N.C. Gen. Stat. § 50-13.2, our courts have concluded that the federal and state constitutions place limitations on the application of § 50-13.1.

As this Court explained in *Ellison v. Ramos*, 130 N.C. App. 389, 392, 502 S.E.2d 891, 893, *appeal dismissed and disc. review denied*, 349 N.C. 356, 517 S.E.2d 891 (1998), despite the statute's "broad language, in the context of a third party seeking custody of a child from a natural (biological) parent, our Supreme Court has indicated that there are limits on the 'other persons' who can bring such an action." A conclusion otherwise " 'would conflict with the constitutionally-protected paramount right of parents to custody, care, and control of their children.' " *Id.* at 393, 502 S.E.2d at 893 (quoting *Petersen*, 337 N.C. at 406, 445 S.E.2d at 906).

---

2. Dwinnell also argues that the trial court erred in denying her motion to dismiss under Rule 12(b)(6). It is, however, "well established that the denial of a Rule 12(b)(6) motion to dismiss is not reviewable upon an appeal from a final judgment on the merits." *Shadow Group, L.L.C. v. Heather Hills Home Owners Ass'n*, 156 N.C. App. 197, 199, 579 S.E.2d 285, 286 (2003). *See also Concrete Serv. Corp. v. Investors Group, Inc.*, 79 N.C. App. 678, 682-83, 340 S.E.2d 755, 758-59 ("[W]here an unsuccessful motion to dismiss is grounded on an alleged insufficiency of the facts to state a claim for relief, and the case thereupon proceeds to judgment on the merits, the unsuccessful movant may not on an appeal from the final judgment seek review of the denial of the motion to dismiss."), *cert. denied*, 317 N.C. 333, 346 S.E.2d 137 (1986).

Applying *Petersen*, this Court concluded that "the relationship between the third party and the child is the relevant consideration for the standing determination." *Id.* at 394, 502 S.E.2d at 894. As a result, "a third party who has no relationship with a child does not have standing under N.C. Gen. Stat. § 50-13.1 to seek custody of a child from a natural parent." *Id.* On the other hand, the Court held "that a relationship in the nature of a parent and child relationship, even in the absence of a biological relationship, will suffice to support a finding of standing." *Id. See also id.* at 395, 502 S.E.2d at 895 (declining to draw a bright line, but rather "confin[ing] our holding to an adjudication of the facts of the case before us: where a third party and a child have an established relationship in the nature of a parent-child relationship, the third party does have standing as an 'other person' under N.C. Gen. Stat. § 50-13.1(a) to seek custody").

This test has since been applied in *Seyboth v. Seyboth*, 147 N.C. App. 63, 554 S.E.2d 378 (2001). Even though the Court held that the trial court erred in awarding visitation to a stepfather based on the "best interest of the child" test without first making the findings mandated by *Petersen* and *Price*, 147 N.C. App. at 68-69, 554 S.E.2d at 382, the Court nonetheless held that the stepfather had standing to seek visitation rights under N.C. Gen. Stat. § 50-13.1 because he had a parent-child relationship with his stepchild. *Id.* at 65-66, 554 S.E.2d at 380-81.

There can be no serious dispute that Mason established that she had standing under N.C. Gen. Stat. § 50-13.1, as limited by *Ellison*. In her complaint, Mason alleged that she and Dwinnell jointly raised the child; they entered into an agreement in which they each acknowledged that Mason was a *de facto* parent and had "formed a psychological parenting relationship with the parties' child;" and "[t]he minor child has lived all his life enjoying the equal participation of both [Mason] and [Dwinnell] in his emotional and financial care and support, guidance and decision-making." These allegations are sufficient under *Ellison* to support the trial court's denial of Dwinnell's motion to dismiss for lack of standing.

The trial court's 1 June 2006 order included numerous findings of fact not challenged on appeal that establish that Mason had a relationship in the nature of a parent-child relationship, including: "Throughout the child's life, [Mason] has provided care for him, financially supported him, and been an integral part of his life such that the child has benefited from her love and affection, caretaking, emotional and financial support, guidance, and decision-making." Other unchal-

lenged findings reveal that this relationship was presented to friends, family, and schools as one of parent and child.

No reasonable basis exists to contend that Mason fails to meet the standard set forth in *Ellison*. Thus, the trial court properly concluded in its 1 June 2006 order that Mason "has standing to pursue custody of the minor child." *See also* 3 Suzanne Reynolds, *Lee's North Carolina Family* Law § 13.4.c.ii, at 13-21 (5th ed. 2002) ("The plain language of the North Carolina statute on standing appears to align the state with broad discretion and a lenient standing requirement even against a parent.").

### Dwinnell's Constitutionally-Protected Interest

**[4]** We next turn to the question whether the district court's findings of fact are sufficient to support its conclusion of law that Dwinnell ·acted in a manner inconsistent with her constitutionally-protected paramount interest in the companionship, custody, care, and control of her child. Under our standard of review in custody proceedings, "the trial court's findings of fact are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary." *Owenby v. Young*, 357 N.C. 142, 147, 579 S.E.2d 264, 268 (2003). Whether those findings of fact support the trial court's conclusions of law is reviewable de novo. *Hall v. Hall*, 188 N.C. App. 527, 530, 655 S.E.2d 901, 904 (2008).

Dwinnell first argues that only conduct that would support a termination of parental rights can meet the requirements of *Price*. This contention was rejected by our Supreme Court in *David N. v. Jason N.*, 359 N.C. 303, 608 S.E.2d 751 (2005).

In *David N.*, the trial court had found that the father was a fit and proper person to care for his child, but nonetheless also found that the father had acted inconsistent with his constitutionally-protected status. This Court reversed the trial court's ruling on the grounds that the "finding of [defendant's] fitness is inconsistent with the conclusion of law that he not be afforded his constitutional right to parent his child." *David N. v. Jason N.*, 164 N.C. App. 687, 690, 596 S.E.2d 266, 268 (2004). The Supreme Court reversed, holding:

It is clear from the holdings of *Petersen, Price,* and *Adams* that a natural parent may lose his constitutionally protected right to the control of his children in one of two ways: (1) by a finding of unfitness of the natural parent, or (2) where the natural par-

ent's conduct is inconsistent with his or her constitutionally pro-
tected status.

359 N.C. at 307, 608 S.E.2d at 753. Because of the disjunctive nature
of the test, the Court held "that the trial court's finding of [the natural
father]'s fitness in the instant case did not preclude it from granting
joint or paramount custody to [the child's grandparents], based upon
its finding that [the father]'s conduct was inconsistent with his con-
stitutionally protected status." *Id.*

In this case, the trial court specifically found that Dwinnell "is a
fit and proper person to exercise legal and physical custody of the
minor child." Therefore, under *David N.*, the question is whether
Dwinnell's conduct was "inconsistent with . . . her constitutionally
protected status." *Id.*

Our Supreme Court in *Petersen* defined that status as the "para-
mount right of parents to custody, care, and control of their children."
337 N.C. at 403-04, 445 S.E.2d at 905. Most recently, the United States
Supreme Court has held: "[I]t cannot now be doubted that the Due
Process Clause of the Fourteenth Amendment protects the funda-
mental right of parents to make decisions concerning the care, cus-
tody, and control of their children." *Troxel v. Granville*, 530 U.S. 57,
66, 147 L. Ed. 2d 49, 57, 120 S. Ct. 2054, 2060 (2000).[3] Thus, the ques-
tion becomes more specifically articulated: Did the legal parent act
inconsistently with her fundamental right to custody, care, and con-
trol of her child and her right to make decisions concerning the care,
custody, and control of that child?

The district court made findings of fact unchallenged on appeal
that Dwinnell and Mason jointly decided to create a family and *inten-
tionally* took steps to identify Mason as a parent of the child, includ-
ing attempting to obtain sperm with physical characteristics similar
to Mason, using both parties' surnames to derive the child's name,
allowing Mason to participate in the pregnancy and birth, holding a

3. It should be noted that this statement of the Due Process right was joined in by
four Justices (Justice O'Connor, Chief Justice Rehnquist, Justice Ginsburg, and Justice
Breyer). Justices Souter and Thomas wrote separate opinions each concurring in the
judgment, but suggesting agreement with the plurality's view of the scope of the con-
stitutional right. Justices Stevens and Kennedy authored separate dissenting opinions
acknowledging the liberty interest, but urging that it should not necessarily preclude
application of a best interests standard when third parties seek visitation. Justice
Scalia filed a third dissenting opinion objecting that "parental rights" are not men-
tioned in the Constitution and that "[j]udicial vindication" of such "parental rights"
risks creating "a new regime of judicially prescribed, and federally prescribed, family
law." 530 U.S. at 92-93, 147 L. Ed. 2d at 73, 120 S. Ct. at 2074.

MASON v. DWINNELL

[190 N.C. App. 209 (2008)]

baptismal ceremony at which Mason was announced as a parent and her parents as grandparents, and designating Mason as a parent of the child on forms and to teachers.

Indeed, Dwinnell has stipulated that "[a]fter the child's birth, he lived with both parties who were acting as a family unit." They remained together as a family for four years. Even after Dwinnell and Mason's relationship ended, Dwinnell allowed Mason to have the functional equivalent of joint custody for a three-year period.

The findings of fact also reveal that Dwinnell and Mason functioned as if both were parents, with Dwinnell agreeing to allow Mason to declare the child as a dependent on her tax returns and the parties sharing caretaking and financial responsibilities for the child. The court found, without challenge by Dwinnell, that Dwinnell "encouraged, fostered, and facilitated the emotional and psychological bond between the minor child and [Mason]" and that "[t]hroughout the child's life, [Mason] has provided care for him, financially supported him, and been an integral part of his life such that the child has benefited from her love and affection, caretaking, emotional and financial support, guidance, and decision-making." As a result, Mason became "the only other adult whom the child considers a parent . . ." Although Dwinnell assigned error to this latter finding of fact, it is supported by clear and convincing evidence and, therefore, is binding.

Moreover, the trial court found—again, in findings not challenged on appeal—that Dwinnell chose to share her decision-making authority with Mason, including decisions on godparents, the child's name, whether the child should attend private school, and the child's extracurricular activities. Further, Dwinnell granted Mason a medical power of attorney, allowing Mason to participate in medical decisions regarding the child and, indeed, both Dwinnell and Mason signed a "consent form for the child to have therapeutic intervention at Developmental Therapy Associates." In the "Parenting Agreement," Dwinnell even agreed that Mason should participate in making "all major decisions regarding their child."

The findings of fact also establish that Dwinnell intended that this parent-like relationship be a permanent relationship for her child. The district court, in reaching its decision, pointed to the Parenting Agreement signed by Dwinnell and Mason when the child was three years old. The district court found that Dwinnell had an opportunity to review the agreement and executed it before a notary public.

MASON v. DWINNELL

[190 N.C. App. 209 (2008)]

Although Dwinnell points to her testimony that she did not voluntarily enter into the agreement, it was for the district court to decide what credibility and weight to give that testimony. *Phelps v. Phelps*, 337 N.C. 344, 357, 446 S.E.2d 17, 25 (1994). In that document, Dwinnell asserted that she and Mason had committed to "jointly parent" the child; that Dwinnell would consent to Mason's adoption of the child if allowed by North Carolina law; that "although [Mason] is not the biological mother, she is a *de facto* parent who has and will provide the parties' child with a stable environment and she has formed a psychological parenting relationship with the parties' child;" that the child's relationship with Mason "should be protected and promoted to preserve the strong emotional ties that exist between them;" and that the purpose of the document was to make provisions for the continuation of the relationship should Dwinnell and Mason cease to live together.

While Dwinnell argues vigorously that the Parenting Agreement is unenforceable, the district court was not required to address that issue and did not do so. Thus, the issue is also not before this Court. Dwinnell mistakes the significance of the document. The district court was not enforcing any agreement, but rather relied upon the agreement as a manifestation of Dwinnell's intent to create a permanent family unit involving two parents and a child that would continue even if the relationship between Dwinnell and Mason did not. Phrased differently, the assertions in the document constitute admissions by Dwinnell regarding her intentions and conduct in creating a permanent parent-like relationship between Mason and her biological child.[4]

We believe these circumstances are analogous to those in *Price*, in which the plaintiff, a man who had previously lived with the child's

4. Dwinnell also asserts that this Court held in *Grindstaff v. Byers*, 152 N.C. App. 288, 567 S.E.2d 429 (2002), decided before *David N.*, "that as a matter of law the signing of an agreement where the parent remains involved in the child's life is not an act inconsistent with a natural parent's constitutionally protected status . . . ." Significantly, in *Grindstaff*, the father entered into a temporary custody agreement that granted full custody to the children's grandmother until he could resume custody. In contrast, the document in this case indicated an intent on the part of Dwinnell to establish a permanent parent-like relationship between Mason and her child. Nothing in *Grindstaff* precluded the district court from considering that aspect of the agreement in this case. *See Cantrell v. Wishon*, 141 N.C. App. 340, 344, 540 S.E.2d 804, 807 (2000) (reversing denial of custody and remanding for findings on whether the mother acted inconsistently with her constitutionally-protected status with a direction to consider, among other factors, "the effect, if any, of the document that the mother signed relinquishing custody of her children to the [third parties]" and "the mother's role in building the relationship between her children and the [third parties]").

mother, sought custody. In *Price*, the biological mother represented to her child and others, including the plaintiff, that he was the child's father even though he was not. 346 N.C. at 83, 484 S.E.2d at 537. According to the Supreme Court, "[s]he chose to rear the child in a family unit with [the] plaintiff being the child's *de facto* father." *Id.* She thus "created" a "family unit" that included a third person and the child. *Id.*

In contrast to this case, however, the mother in *Price* relinquished all custody to the plaintiff for a period of time. The parties disputed "whether defendant's voluntary relinquishment of custody to plaintiff was intended to be temporary or indefinite and whether she informed plaintiff and the child that the relinquishment of custody was temporary." *Id.* The Court explained:

> This is an important factor to consider, for, if [the mother] had represented that [the plaintiff] was the child's natural father and voluntarily had given him custody of the child for an indefinite period of time with no notice that such relinquishment of custody would be temporary, [*the mother*] *would have not only created the family unit that plaintiff and the child have established, but also induced them to allow that family unit to flourish in a relationship of love and duty with no expectations that it would be terminated.*

*Id.* (emphasis added). If, however, the parties agreed that the plaintiff would have custody for only a temporary period of time, the mother "would still enjoy a constitutionally protected status absent other conduct inconsistent with that status." *Id.* The Court, therefore, remanded for further findings of fact.

While this case does not involve the biological mother's leaving the child in the care of a third person, we still have the circumstances of Dwinnell's intentionally creating a family unit composed of herself, her child and, to use the Supreme Court's words, a "*de facto* parent." *Id.* Indeed, as occurred in *Price* for a period of time, they all lived together as a family and Dwinnell led her child to believe that Mason was one of his parents. Even though Dwinnell did not completely relinquish custody, she fully shared it with Mason, including sharing decision-making, caretaking, and financial responsibilities for the child. And, in contrast to *Price*, the findings establish that Dwinnell intended—during the creation of this family unit—that this parent-like relationship would be permanent, such that she "induced [Mason and the child] to allow that family unit to flourish in a relationship of

love and duty with no expectations that it would be terminated." *Id.* Ultimately, Dwinnell succeeded: the district court found that Mason and the child forged a strong parent-child bond.

As the South Carolina Court of Appeals has recognized: "[W]hen a legal parent invites a third party into a child's life, and that invitation alters a child's life by essentially providing him with another parent, *the legal parent's rights to unilaterally sever that relationship are necessarily reduced.*" *Middleton v. Johnson,* 369 S.C. 585, 597, 633 S.E.2d 162, 169 (S.C. Ct. App. 2006) (emphasis added). "A parent has the absolute control and ability to maintain a zone of privacy around his or her child. However, a parent cannot maintain an absolute zone of privacy if he or she voluntarily invites a third party to function as a parent to the child." *Id.*

Similarly, the New Jersey Supreme Court has held: "[A] parent has the absolute ability to maintain a zone of autonomous privacy for herself and her child. However, if she wishes to maintain that zone of privacy she cannot invite a third party to function as a parent to her child and cannot cede over to that third party parental authority the exercise of which may create a profound bond with the child." *V.C. v. M.J.B.*, 163 N.J. 200, 224, 748 A.2d 539, 552, *cert. denied,* 531 U.S. 926, 148 L. Ed. 2d 243, 121 S. Ct. 302 (2000).

Thus, like all parents, Dwinnell had the constitutionally-protected right to "maintain a zone of privacy" around her and her child. *Id.* Indeed, since no biological father was present, Dwinnell exercised exclusive and autonomous parental authority in relation to her child. She nonetheless voluntarily chose to invite Mason into that relationship and function as a parent from birth on, thereby materially altering her child's life. She gave up her right to unilaterally exclude Mason (or unilaterally limit contact with Mason) by choosing to cede to Mason a sufficiently significant amount of parental responsibility and decision-making authority to create a permanent parent-like relationship with her child.

The New Jersey Supreme Court's opinion in *V.C.* describes the situation exactly:

> What we have addressed here is a specific set of circumstances involving the volitional choice of a legal parent to cede a measure of parental authority to a third party; to allow that party to function as a parent in the day-to-day life of the child; and to foster the forging of a parental bond between the third party and the child.

In such circumstances, the legal parent has created a family with the third party and the child, and has invited the third party into the otherwise inviolable realm of family privacy. By virtue of her own actions, the legal parent's expectation of autonomous privacy in her relationship with her child is necessarily reduced from that which would have been the case had she never invited the third party into their lives.

163 N.J. at 227, 748 A.2d at 553-54. The court concluded: "Most important, where that invitation and its consequences have altered her child's life by essentially giving him or her another parent, the legal parent's options are constrained. It is the child's best interest that is preeminent as it would be if two legal parents were in a conflict over custody and visitation." *Id.*, 748 A.2d at 554. *See also T.B.*, 567 Pa. at 232, 786 A.2d at 919 ("[A] biological parent's rights do not extend to erasing a relationship between her partner and her child which she voluntarily created and actively fostered simply because after the parties' separation she regretted having done so." (internal quotation marks omitted)).

We stress that the cases that we have cited from other jurisdictions have each applied, as we do, a test applicable generally to third parties seeking custody of a child contrary to the wishes of the legal parent. *See V.C.*, 163 N.J. at 205-06, 748 A.2d at 542 ("Although the case arises in the context of a lesbian couple, the standard we enunciate is applicable to all persons who have willingly, and with the approval of the legal parent, undertaken the duties of a parent to a child not related by blood or adoption."); *T.B.*, 567 Pa. at 232, 233, 786 A.2d at 918, 919 (holding that in determining whether a former domestic partner had standing to seek visitation, "a well-established common law doctrine" applied and "the nature of the relationship between Appellant and Appellee has no legal significance"); *Middleton*, 369 S.C. at 593, 633 S.E.2d at 167 ("In this case, we are asked to determine what legal standard applies to a third party's claim for visitation of a non-biological child for whom he claims to have functioned as a psychological parent.").

In sum, we conclude that the district court's findings of fact establish that Dwinnell, after choosing to forego as to Mason her constitutionally-protected parental rights, cannot now assert those rights in order to unilaterally alter the relationship between her child and the person whom she transformed into a parent. Her choice does not mean that Mason is entitled to the rights of a legal parent, but only that a trial court may apply the "best interest of the child" standard in

considering Mason's request for custody, including visitation. *See, e.g., id.* at 599-600, 633 S.E.2d at 170 (holding third party entitled to visitation when mother invited him "to act as a father," child lived with third party at least half of the week for most of his life, and mother ceded over large part of parental responsibilities, thereby fostering parent-child bond between third party and child).[5]

[5] Dwinnell, however, argues that because of the absence of abandonment, her conduct can only be described as "good acts," enriching her child's life by involving Mason as a parental figure. She contends that the Supreme Court in *Price* did not contemplate that "good acts" could be inconsistent with a parent's constitutionally-protected status.

Neither our Supreme Court nor the United States Supreme Court has yet required a showing of "bad acts" as opposed to conduct inconsistent with the parent's paramount constitutional interest. In *Troxel,* the United States Supreme Court plurality expressly declined to decide "whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation." *Troxel,* 530 U.S. at 73, 147 L. Ed. 2d at 61, 120 S. Ct. at 2064. Instead, the plurality reasoned that the more neutral concept of *"special factors . . .* might justify the State's interference with [the biological mother's] fundamental right to make decisions concerning the rearing" of her children. *Id.* at 68, 147 L. Ed. 2d at 58, 120 S. Ct. at 2061 (emphasis added).

When examining a legal parent's conduct to determine whether it is inconsistent with his or her constitutionally-protected status, the focus is not on whether the conduct consists of "good acts" or "bad acts." Rather, the gravamen of "inconsistent acts" is the volitional acts of the legal parent that relinquish otherwise exclusive parental authority to a third party.

In any event, Dwinnell has misunderstood the nature of her conduct, as found by the district court, and its consequences. As *Price*

---

5. Although Dwinnell points to *Seyboth,* as supporting her position, this Court held, in that case, only that "the trial court erred in applying the best interest of the child analysis without first determining whether defendant engaged in conduct inconsistent with her parental rights and responsibilities." 147 N.C. App. at 68, 554 S.E.2d at 382. The Court, therefore, remanded so that the trial court could hear additional evidence and make the required findings. *Id.* at 68-69, 554 S.E.2d at 382. In this case, the district court complied with *Seyboth* by making the necessary findings of fact regarding defendant's conduct prior to applying the "best interest of the child" standard.

itself implicitly recognized in the language quoted above, encouraging a child to view a third person, with whom the child lives, as a parent and to develop a parent-child bond with that person with the expectation that it would continue and then severing that relationship cannot be viewed as benign conduct. *See, e.g., Middleton,* 369 S.C. at 599, 633 S.E.2d at 169 (acknowledging risk of emotional harm to child in severance of parent-like relationship and stressing that "South Carolina has long recognized the importance of the degree of attachment, echoed by other jurisdictions, between a child and a third-party in making a custody determination between a biological parent and the third party"). Indeed, the United States Supreme Court in *Smith v. Org. of Foster Families for Equal. & Reform,* 431 U.S. 816, 844, 53 L. Ed. 2d 14, 35, 97 S. Ct. 2094, 2109-10 (1977) (internal quotation marks and citations omitted), has stressed that "the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promot[ing] a way of life through the instruction of children, as well as from the fact of blood relationship."

Our Supreme Court recognized these effects 50 years ago in *In re Gibbons,* 247 N.C. 273, 280, 101 S.E.2d 16, 21-22 (1957), when it held that the legal right of a parent to custody may yield to the interests of the child when the parent

> has voluntarily permitted the child to remain continuously in the custody of others in their home, and has taken little interest in [the child], thereby substituting such others in his own place, so that they stand in *loco parentis* to the child, and continuing this condition of affairs for so long a time that the love and affection of the child and the foster parents have become mutually engaged, *to the extent that a severance of this relationship would tear the heart of the child, and mar his happiness.*

(Emphasis added.) The Court explained that the biological father, "having permitted" the family unit of his child and his grandmother to develop, " 'claims the right, because he is the father, to sever the ties which bind this child to the respondent.' " *Id.* at 281, 101 S.E.2d at 22 (quoting *Merchants v. Bussell,* 139 Me. 118, 124, 27 A.2d 816, 819 (1942)). The Court held: " 'In this instance the welfare of the child is paramount. *The dictates of humanity must prevail over the whims and caprice of a parent.*' " *Id.* (emphasis added) (quoting *Merchants,* 139 Me. at 124, 27 A.2d at 819).

Although Dwinnell, in contrast to the father in *Gibbons*, did not relinquish custody completely to another, her conduct had precisely the same potential to "tear the heart of the child, and mar his happiness." *Id.* at 280, 101 S.E.2d at 22. Under these circumstances, the district court could properly conclude, as it did, that Dwinnell acted in a manner inconsistent with her constitutionally-protected paramount interest in the companionship, custody, care, and control of her child. The proper standard for determining custody was, therefore, the "best interest of the child" standard.

Although some courts in other states have attempted to create a bright-line test for when the "best interest of the child" standard should apply as between a legal parent and a third party, our Supreme Court, in *Price*, stressed that a parent's conduct "need[s] to be viewed on a case-by-case basis." 346 N.C. at 83, 484 S.E.2d at 537. *See also id.* at 79, 484 S.E.2d at 534-35 ("Other types of conduct, which must be viewed on a case-by-case basis, can also rise to this level so as to be inconsistent with the protected status of natural parents."). This Court, in turn, in discussing standing to seek custody, similarly observed: "After due consideration, it would seem to us that at this time drawing a bright line for all such cases would be unwise." *Ellison*, 130 N.C. App. at 395, 502 S.E.2d at 895. We explained that "any rule crafted now would face a serious risk of stumbling upon unforeseen pitfalls" and, therefore, we "confine[d] our holding to an adjudication of the facts of the case before us . . . ." *Id.*

### Best Interest of the Child

[6] Dwinnell argues alternatively that if the "best interest of the child" standard does apply, the district court erred in granting permanent joint custody to both parties because the best interests of her child were not served by such an award. It is well established that the district court's determination regarding the best interest of the child will not be disturbed unless there is an abuse of discretion. *Dixon v. Dixon*, 67 N.C. App. 73, 76, 312 S.E.2d 669, 672 (1984). As this Court has explained:

> [T]rial courts have the duty to decide domestic disputes, guided always by the best interests of the child and judicial objectivity. To that end, trial courts possess broad discretion to fashion custodial and visitation arrangements appropriate to the particular, often difficult, domestic situations before them. The decision of the trial judge, who sees and hears the witnesses and observes their demeanor, ought not to be upset on appeal absent a clear showing of abuse of that discretion.

*Glesner v. Dembrosky*, 73 N.C. App. 594, 598, 327 S.E.2d 60, 63 (1985) (internal citations omitted).

We first note that in challenging the trial court's application of the "best interest of the child" standard, Dwinnell has failed to cite any authority in support of her position. "Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated *or authority cited,* will be taken as abandoned." N.C.R. App. P. 28(b)(6) (emphasis added). Even if we consider Dwinnell's unsupported argument, it is without merit.

Dwinnell first asserts: "Given the fact that this case deals with a natural parent and a third party, the court finding that the natural parent had always been a fit parent, and finding that the natural parent always put the best interest of the child first, the court should not have ordered the natural parent to have joint legal custody of the minor child with [Mason]." This contention simply represents a rephrasing of Dwinnell's initial contention that as between a fit parent and a third party, the district court may not award custody to the third party over the objection of the natural parent. Because we have held that the district court could properly apply the "best interest of the child" standard, the court was entitled to decide whether joint custody between Dwinnell and Mason was in the child's best interests. While the district court could conclude that Dwinnell's fitness warranted that she have sole custody, it was not required to do so if the evidence indicated that the child's best interests required a different result.

Dwinnell next asserts that "[t]he court entered no findings to support it's [sic] conclusion that a joint physical custodial schedule that provided week to week visitation was in the best interest of the minor child." Immediately following this statement, Dwinnell points to evidence supporting her position and argues that the trial court "did not address [this evidence] in the findings of fact and still concluded that a joint physical custodial schedule that provided week to week visitation with the parties was in the best interest of the child."

Significantly, Dwinnell does not acknowledge that the district court's "best interests" determination is reviewed for an abuse of discretion. Contrary to Dwinnell's contention, our review of the district court's order indicates that it is supported by sufficient findings of fact. The court found that the child considers Mason to be a parent; that an emotional and psychological bond exists between the child and Mason; that the child "has benefited from [Mason's] love and

affection, caretaking, emotional and financial support, guidance, and decision-making"; that one therapist concluded from his discussions with the child that he "wished to maintain equal time with both parties, but preferred to remain at one house for an entire week and have a midweek dinner visit with the other party"; that the court adopted a temporary custody schedule consistent with this expressed desire; and that from the rendering of the temporary joint custody decision in December 2004 through the permanent custody decision in November 2005, the parties had been following the alternating weekly custodial schedule.

The court also found that during that period, "[a]ll of the child's end of year progress reports from his teachers at Carolina Friends School show that the child is performing well in all areas, including academically, socially and emotionally." In addition, the court found: "The minor child has been participating in therapy with Dr. Sortisio since the spring of 2005. The Court finds Dr. Sortisio's testimony that the child is doing well with an alternating custodial schedule credible as well as her conclusion that the child's previous signs of distress have greatly diminished."

These findings of fact are sufficient to support the district court's conclusions that (1) "[i]t is in the best interest of the minor child that the parties be granted permanent joint legal and physical custody of the minor child;" and (2) that the parties should alternate custody on a weekly basis. Dwinnell has not argued that these findings of fact are unsupported by evidence; the mere fact that contrary evidence may exist does not justify reversal.[6] Dwinnell makes no other specific argument regarding the district court's award of joint custody and, therefore, has presented no persuasive basis for overturning the district court's order.

## Conclusion

Although this appeal arises in the context of a same-sex domestic partnership, it involves only the constitutional standards applicable to all custody disputes between legal parents and third parties. We simply apply the law as set forth by our Supreme Court in *Price*, consistent with the holdings of the United States Supreme Court. Courts do not violate a parent's constitutionally-protected interest by respecting the parent-child relationships that the legal parent—in accordance with her constitutional rights—voluntarily chose to create.

---

6. Further, the district court was not required to make findings of fact on every piece of evidence. *Quick v. Quick*, 305 N.C. 446, 451, 290 S.E.2d 653, 657 (1982).

We hold, under the circumstances of this case, as found by the district court, that Dwinnell made the choice, with respect to Mason's relationship to her child, to act in a manner inconsistent with her constitutionally-protected right to custody, care, and control of her child and her right to exclusively make decisions concerning the care, custody, and control of that child. The district court, therefore, properly concluded it should apply the "best interest of the child" standard. At that point, it was up to the parties to establish the best interests of the child. Since Dwinnell has failed to demonstrate that the district court's "best interests" determination was an abuse of discretion, we affirm.

Affirmed.

Judges BRYANT and STEELMAN concur.