**SIDES v. IKNER**

[222 N.C. App. 538 (2012)]

───────────────

CHAD LEE SIDES, Plaintiff v. CHARITY IKNER, (Now SMITH), Defendant
v. TAMARA LEONARD, Intervenor

No. COA12-165

(Filed 21 August 2012)

**1. Appeal and Error—jurisdiction—intervention order—appeal only from custody order**

The Court of Appeals did not have jurisdiction to consider an intervention order in a child custody case where the appeal was only from the custody order.

**2. Child Custody and Support—intervention by grandmother— parent acting inconsistently with rights—failure to seek custody—adherence to prior order**

The trial court erred by concluding that a child's father (plaintiff) acted inconsistently with his parental rights by allowing the intervenor (the maternal grandmother) to act as a parent without taking action to obtain custody himself. The father did not intentionally create a parental role for the grandmother, but merely followed an earlier custody order that gave the father joint legal custody and secondary physical custody. The father was involved in the child's life to the full extent allowed by the prior custody order and did not know that defendant (the mother) would be moving away from the grandmother's home permanently. He stated his objection to the child remaining with the grandmother as soon as he learned of defendant's move.

Appeal by plaintiff from order entered 30 August 2011 by Judge Jacquelyn L. Lee in District Court, Harnett County. Heard in the Court of Appeals 7 June 2012.

*Terry F. Rose and George R. Murphy, for plaintiff-appellant.*

*Cecil B. Jones, for intervenor-appellee.*

STROUD, Judge.

This appeal arises from a custody dispute between plaintiff, father of Luke[1] ("Father"), the minor child, and intervenor, maternal grandmother of Luke ("Grandmother"). The trial court awarded Grandmother primary physical custody of Luke and Father secondary physical custody. Father appealed. For the following reasons, we conclude that the trial court erred in concluding that Father "acted inconsistently with [his] parental rights and responsibilities and [his] constitutionally protected status[;]" thus, this case is reversed and remanded for entry of an order consistent with this opinion.

I. Background

This case began when Father filed a complaint against Defendant, Luke's mother, seeking custody of Luke on 17 November 2006. Father and Defendant agreed to an order entered on 2 April 2007 ("2007 Custody Order") which stated "[t]hat the parties share joint legal cus-

---

1. A pseudonym will be used to protect the minor child's identity.

**SIDES v. IKNER**

[222 N.C. App. 538 (2012)]

tody with the Defendant having primary physical custody and the Plaintiff having secondary physical custody[.]" The 2007 Custody Order set forth a detailed custodial schedule for the parents that gave Father physical custody on alternating weekends and holidays such as Easter, Thanksgiving, Christmas; all Father's Days; and four weeks in summer. The 2007 Custody Order also contained other detailed provisions regarding Luke's physical custody which are pertinent to the issues raised in this case:

> 4. All exchanges of the minor child shall occur at the Lillington McDonald's. The parties agree and consent that because of their work schedules that either of the parties spouses or family members are authorized to conduct the exchanges.

> 5. Neither party shall allow the minor child to call the party's significant other "Mom", "Dad", or similar appellation. Nor shall either party allow any third party to refer to the party's significant other by such appellation. Each party shall make sure that they have explained this provision to their significant other and to their family members.

> . . . .

> 9. That the following provisions shall apply:

> a. The parties must agree with respect to major decisions concerning the health, education, religious training, extracurricular activities and general welfare of the minor child[]. Day to day decisions of lesser import shall be made by the party having custody of the minor child[] at the time the need for the decision arises;

> b. Each party shall have direct access to the health care providers, teachers, counselors and religious advisors of the minor children the same as if she or he was the sole custodian of the child[];

> c. Each party shall have the right to authorize medical treatment for the minor child[]. Any party making appointments for the minor child[] with any doctor shall notify the other party of the appointment as soon as it is made so that party may be allowed to go to the appointment. Each party shall have to provide their own transportation;

> d. Each party shall notify the other of any emergency situation involving . . . the minor child[] as soon as practicable;

e.   Each party shall keep the other apprised at all times of their current residence address and all telephone numbers and shall promptly notify the other of any changes to the same within 5 days of said changes. Additionally, each party shall provide the other with their address, phone numbers and a list of who resides with them on March 27, 2007 and the parties have done so.

f.   Neither party shall make plans for the minor child[] or schedule activities for the minor child[] during the other party's designated times without the prior permission of the other party;

g.   Neither party shall threaten to withhold the minor child[] from the other party, to extend their designated time with the minor child[] or refuse to return the minor child[] at the end of their designated time with the child[];

. . . .

[i.]   Each party shall have reasonable telephonic access to the minor child[] when in the care of the other party;

j.   Each party may take the minor child[] outside of the state of North Carolina during their designated times with the child[] however, the party removing the minor child[] from the state of North Carolina shall provide to the other party prior notification of this trip and shall provide the other party with contact information for the minor child[];

k.   *If either party shall relocate more than fifty (50) miles from their current residence, they shall give the other 60 days notice and the parties may motion the court to review the issues of custody or visitation if they are unable to resolve the matters between themselves;*

. . . .

n.   *Both parties shall make each and every term of this Order regarding the custody and care of the minor children known to any future spouse, the minor child[ ]'s grandparents, aunts and uncles, and shall encourage all such persons to act in accordance therewith.*

(Emphasis added.)

On 28 May 2010, Grandmother filed a motion to intervene in the custody case between Father and Defendant. On 8 July 2010, Father filed a motion to modify custody and a motion to dismiss Grandmother's motion to intervene. On 4 August 2010, Grandmother filed a "SUPPLEMENT TO MOTION" to her prior motion to intervene, stating that

> [a]t the time of said filing, the proposed Intervenor truly believed the Plaintiff would consent to custody being placed with her. As such, the proposed Intervenor, while properly alleging that the Plaintiff "acted inconsistently with his constitutionally protected status as a parent," intentionally did not use that specific phrase. Nor did she set forth all facts over the past two or more years that support that contention.

The supplement went on to allege the facts Grandmother claimed supported her contentions. On 1 December 2010, after a hearing, the trial court entered an order ("intervention order") allowing Grandmother's motion to intervene and denying Father's motion to dismiss Grandmother's motion to intervene.

On 2 December 2010, Grandmother filed a motion for custody. On 30 August 2011, after a hearing, the trial court entered an order ("custody order"), including the following findings of fact:

1.    That the Plaintiff and Defendant are the parents of minor child namely: . . . [Luke], born May 1, 2004.

2.    That the Intervenor is the maternal grandmother of the minor child and resides in Harnett County, N.C.

3.    That the Plaintiff is the natural father of the minor child and resides in Rowan County, N.C.

4.    On April 2, 2007 an order was entered in this cause ordering that the Plaintiff and Defendant share joint legal custody of the minor child, . . . [Luke] born on May 1, 2004 with the Defendant having primary physical custody of the minor child and the Plaintiff having secondary physical custody in the form of visitation as set forth in the April 2, 2007 order.

    . . . .

7.    That in approximately July of 2004 the minor child and the Defendant were dropped off at the Intervenor's house by the Plaintiff and since said date has mainly resided at the home of the Intervenor . . . .

. . . .

9.    Since the entry of the April 2, 2007 order the Plaintiff has exercised the secondary physical custody awarded him by collecting the child every other Friday from the child's school or daycare and having the child reside with him . . . for the remainder of the weekend. The Plaintiff has exercised all holiday, summer and any other secondary physical custody granted him in the April 2, 2007 order since the entry of the order to date.

10.    In May 2009, the Defendant informed the Plaintiff she was joining the United States Air Force Reserves and would be traveling to the State of Georgia for basic training for approximately eight weeks. The minor child continued to reside with the Intervenor during the Defendant's absence. The Plaintiff continued to see the minor child every other weekend during that period of time.

11.    That prior to leaving for Georgia on May 9, 2009, the Defendant executed an "Educational Power of Attorney" that allowed the Intervenor to enroll the minor child in school and otherwise assist the minor child in obtaining his education. The Plaintiff was unaware of this Power of Attorney.

12.    That in approximately August of 2009 the Plaintiff asked the Intervenor when the Defendant would be returning from basic training . . . .

. . . .

15.    . . . [T]he Plaintiff was informed by the Defendant she had not joined the United States Air Force Reserves but had joined the United States Air Force and her husband was to be stationed in Germany. The Defendant requested the Plaintiff allow her to take the minor child with her to Germany. The Plaintiff refused and informed the Defendant if she was not going to be in Harnett County to care for the child he believed the child should be with him and not the Intervenor on a regular basis. The Intervenor also objected to this move.

16.    On May 28, 2010 the Intervenor filed a Motion to Intervene and a Motion for Custody.

17.    On July 8, 2010 the Plaintiff filed a Motion to Dismiss the Intervention, Motion to Dismiss the Motion for Custody and Motion to Modify Custody.

. . . .

19. On August 9, 2010 the district court in Harnett County allowed the intervention by the maternal grandmother by order filed December 1, 2010.

. . . .

31. That the Intervenor arranged for the minor child to attend school and daycare and appropriately monitors the minor child's progress at both locations, often times volunteering and attending all activities and conferences.

32. The Plaintiff is aware of, has visited and approves of the daycare facility the minor child attends before and after school. The Plaintiff is also aware of, visits when he collects the child and approves of the school in which the minor child is enrolled. The Plaintiff has communicated with the teachers of the minor child regarding his progress.

. . . .

43. That the minor child is involved in Boy Scouts, karate, and attends church at Calvary Church with Intervenor and some of her [h]usband's family members.

. . . .

46. That there are numerous family members of the Intervenor's husband that reside nearby and have a close relationship with the minor child.

. . . .

49. That the Intervenor has arranged for all medical and dental care of the minor child for the last several years and notifies the Plaintiff of various activities concerning the minor child and informs him of occasions where he is sick or is in need of medication so that the same can be given to the minor child during visitations. The minor child is relatively healthy.

50. The April 2, 2007 order set child support for the minor child. The Plaintiff has paid child support each month since the entry of the order, is current with the child support order and has never been more than one month late on child support.

51. The Plaintiff remains married to the spouse to whom he was married at the time the April 2, 2007 custody order was

**SIDES v. IKNER**

[222 N.C. App. 538 (2012)]

entered. The Plaintiff continues to reside in an appropriate home with his wife and her son of whom she has sole custody. The Plaintiff has another son who he has every other weekend visitation with and with who he coordinates those weekend visits with visits with this minor child so the step-brothers may have a sibling relationship. This living situation was noted in the April 2, 2007 order and has not changed since that time.

52. The Plaintiff provides health insurance for the minor child and has provided health insurance for the minor child since birth except for one eighteen month period when the Plaintiff was unemployed due to a reduction in work force with a previous employer.

The trial court concluded that although both Father and Grandmother were "fit and proper persons to exercise the care, custody and control of the minor child[,]" Father had "acted inconsistently with [his] parental rights and responsibilities and [his] constitutionally protected status as demonstrated by clear and convincing evidence." The trial court also concluded that "[i]t is in the best interests of the minor child that the Intervenor and the [Father] share joint legal custody of the minor child with the Intervenor having primary physical custody and the [Father] having secondary physical custody[.]" Father appealed.

## II. Intervention Order

**[1]** Father brings forth three arguments on appeal regarding the intervention order. However, in Father's notice of appeal he only appeals from the custody order. As Father failed to appeal from the intervention order, this Court does not have jurisdiction to consider that order, and thus we dismiss these arguments. *See Zairy v. VKO, Inc.*, ____ N.C. App. ____, ____, 712 S.E.2d 392, 393 (2011) (dismissing a portion of plaintiff's appeal pursuant to North Carolina Rules of Appellate Procedure Rule 3(d) because without a notice of appeal designating the specific orders or judgments being appealed from, this Court did not have jurisdiction to consider the argument).

## III. Custody Order

**[2]** Father appeals the custody order essentially contending that the trial court erred in concluding that he had "acted inconsistently with his parental rights and responsibilities and his constitutionally protected status to parent his child[.]"[2]

2. Though Father's brief discusses various findings of fact, the crux of his argument focuses on the trial court's conclusion that he had acted inconsistent with his

**SIDES v. IKNER**

[222 N.C. App. 538 (2012)]

A. General Law on Parent's Constitutional Paramount Right

"Whether conduct constitutes conduct inconsistent with the parents' protected status presents a question of law and, thus, is reviewable *de novo.*" *Rodriguez v. Rodriguez,* \_\_\_\_ N.C. App. \_\_\_\_, \_\_\_\_, 710 S.E.2d 235, 242 (2011) (citation, quotation marks, ellipses, and brackets omitted).

This Court has recognized the paramount right of parents to the custody, care, and control of their children. In *Petersen,* this Court held that absent a finding that parents (i) are unfit or (ii) have neglected the welfare of their children, the constitutionally-protected paramount right of natural parents to custody, care, and control of their children must prevail.

In *Price v. Howard,* 346 N.C. 68, 484 S.E.2d 528 (1997), this Court refined the holding in *Petersen. Price,* as in the case at bar, involved a custody dispute between a natural parent and a third party who was not a natural parent. This Court reaffirmed the position that natural parents have a constitutionally protected right in the care, custody, and control of their children, but noted, however, that while a fit and suitable parent is entitled to the custody of his child, it is equally true that where fitness and suitability are absent he loses this right.

Where there are unusual circumstances and the best interest of the child justifies such action, a court may refuse to award custody to either the mother or father and instead award the custody of the child to grandparents or others. There may be occasions where even a parent's love must yield to another if after judicial investigation it is found that the best interest of the child is subserved thereby.

This Court, in *Price,* further expounded as follows:

A natural parent's constitutionally protected paramount interest in the companionship, custody, care, and control of his or her child is a counterpart of the parental responsibilities the parent has assumed and is based on a presumption that he or she will act in the best interest of the child.

constitutionally protected paramount parental status. Presumably, the Father's focus is not on the findings of fact as most are favorable to him. Furthermore, Grandmother does not cross-appeal challenging any of the findings of fact, and thus they are binding on appeal. *See Estroff v. Chatterjee,* 190 N.C. App. 61, 71, 660 S.E.2d 73, 79 (2008) ("Findings of fact are . . . binding on appeal . . . unless assigned as error.")

Therefore, the parent may no longer enjoy a paramount status if his or her conduct is inconsistent with this presumption or if he or she fails to shoulder the responsibilities that are attendant to rearing a child.

In *Adams v. Tessener*, this Court reviewed the earlier principles set forth in *Petersen* and *Price* and stated:

> *Petersen* and *Price*, when read together, protect a natural parent's paramount constitutional right to custody and control of his or her children. The Due Process Clause ensures that the government cannot unconstitutionally infringe upon a parent's paramount right to custody solely to obtain a better result for the child. As a result, the government may take a child away from his or her natural parent only upon a showing that the parent is unfit to have custody or where the parent's conduct is inconsistent with his or her constitutionally protected status.

> . . . .

> It is clear from the holdings of *Petersen, Price*, and *Adams* that a natural parent may lose his constitutionally protected right to the control of his children in one of two ways: (1) by a finding of unfitness of the natural parent, or (2) where the natural parent's conduct is inconsistent with his or her constitutionally protected status.

*David N. v. Jason N.*, 359 N.C. 303, 305-07, 608 S.E.2d 751, 752-53 (2005) (citations and quotation marks omitted).

B. 2007 Custody Order

In this particular case, the custody order is also a modification of the prior 2007 Custody Order. Thus, the trial court's custody order must be considered in the context of the 2007 Custody Order which governed the conduct of Father and Defendant from 2007 until the entry of the present custody order. Several provisions of the 2007 Custody Order are particularly important.

First, Father had joint legal and secondary physical custody of Luke. The 2007 Custody Order required the parties to inform Luke's "grandparents, aunts, and uncles" of "each and every term" of the 2007 Custody "Order regarding the custody and care" of Luke; thus, unless Defendant violated her duty under the 2007 Custody Order, Grandmother was also aware of the provisions of the 2007 Custody

Order. The 2007 Custody Order also required each party to notify the other at least 60 days in advance of relocating more than 50 miles from their residence at the time of entry of the 2007 Custody Order; accordingly, Defendant was required to inform Father of her impending relocation so that the parties could try to resolve the custody situation or file a motion with the court if they were unable to do so. The 2007 Custody Order further provided that other family members were allowed to conduct the exchanges of Luke. Thus, the 2007 Custody Order set out a comprehensive custodial plan which sought to protect the rights of both parents and their relationships with Luke but also permitted participation by third parties, such as Grandmother.

C. Grandmother's Contentions

Grandmother's primary argument on appeal centers on her contention that Father "allowed for the Intervenor to act as the parent of this minor child for most of his life without taking action to obtain custody himself." Grandmother's argument overlooks one very important fact: Father had joint legal and secondary physical custody of Luke under the 2007 Custody Order. In addition, according to the trial court's custody order which Grandmother did not appeal from, Father had met his child support obligations and "exercised *all* holiday, summer and any other secondary physical custody granted" by the 2007 Custody Order, despite the fact that he resided about 115 miles from Grandmother's home.[3] (Emphasis added.)

---

3. We take judicial notice that based upon Father's and Grandmother's addresses provided in the record, Father and Grandmother live approximately 115 miles apart from one another. *State v. Saunders*, 245 N.C. 338, 342-43, 95 S.E.2d 876, 879 (1957) ("[W]e think the court should have taken judicial notice of these distances without proof. In the early case of *Furniture Co. v. Southern Express Co.*, 144 N.C. 639, 57 S.E. 458, decided in 1907, this Court said: It is generally held that the courts will take judicial notice of the placing of the important towns within their jurisdiction and especially of county seats and their accessibility by railroads connecting them with trunk lines of the country; and there is well considered authority to the effect that courts may also take such notice of the distance to prominent business centers of other states, etc. A much stronger case for taking such notice can be made out today when almost every town in the country is connected by a ribbon of concrete or asphalt over which a constant stream of traffic flows. Every filling station has maps available to the traveler without charge. Highway signs at road crossings give both distance and direction. In fact, so complete and so general is the common knowledge of places and distances that the court may be presumed to know the distances between important cities and towns in this State and likewise in adjoining states." (quotation marks and ellipses omitted)).

In other words, Father had complied with the 2007 Custody Order; Defendant had not complied. In particular, as the trial court found, Defendant concealed the fact that she had joined the United States Air Force and that she would be moving to Germany until December of 2009. In May of 2009,[4] prior to going to basic training, "Defendant executed an 'Educational Power of Attorney' that allowed the Intervenor to enroll the minor child in school[;]" "Plaintiff was unaware of this Power of Attorney." Under the 2007 Custody Order, Father had an equal right to make educational decisions for Luke, and Defendant did not actually have the legal authority to grant the power of attorney without his participation. As such, due to Defendant's and Grandmother's actions, Father was deprived of the opportunity to participate fully in decisions regarding Luke's education.

Though Grandmother may have largely provided for the day-to-day care of Luke, Father reasonably engaged in Luke's care when taking into consideration the distance between them and the 2007 Custody Order in place. Even so, Grandmother argues that Father's delay in seeking to modify custody, even after learning that she, not Defendant, was the one who was primarily caring for Luke, was a relinquishment of Father's "constitutionally protected right to the control of his child[.]" *David N.*, 359 N.C. at 307, 608 S.E.2d at 753. Grandmother contends that

> [b]etween May, 2009 and May, 2010 the Plaintiff never indicated that he was dissatisfied with the minor child remaining with the Intervenor or that he intended to remove this child from her residence. If a parent cedes paramount decision making authority, then so long as he or she creates no expectation that the arrangement is for only a temporary period, that parent has acted inconsistently with his paramount parental status. Boseman v. Jarrell, 364 N.C. 537, 552, 704 S.E.2d 494, 504 (2010)[.] The trial court should look at the intentions and conduct of the parents towards the third person to determine whether there has been created a permanent parent like relationship with their child. Estroff v. Chatterjee, 190 N.C. App. 61, 70, 660 S.E.2d 73, 78-79 (2008)[.] This court has recognized that acts inconsistent with a parent's constitutionally protected status may include failure to resume custody when able. Price, 346 N.C. at 84, 484 S.E.2d at 537[.]

> Plaintiff allowed for the Intervenor to act as the parent of this minor child for most of his life without taking action to obtain custody himself.

---

4. Luke's fifth birthday was May 1, 2009.

Thus, Grandmother contends that Father knowingly relinquished his parental rights and allowed her to assume a parental role as he permitted Luke to remain in her home when Defendant was absent from Grandmother's home.

D.  Law on Third Parties Acting as Parents

*Price v. Howard* addresses the circumstances under which a parent may lose his constitutionally protected right to custody by a voluntary relinquishment of those rights by allowing a third party to assume a parental role. *Price v. Howard*, 346 N.C. 68, 83-84, 484 S.E.2d 528, 537 (1997). In *Price*, the child's mother "represented to the child and to others that plaintiff was the child's natural Father. She chose to rear the child in a family unit with plaintiff being the child's *de facto* father." *Id.* at 83, 484 S.E.2d at 537. The Supreme Court ultimately remanded the case to the trial court as there was a dispute as to

> whether defendant's voluntary relinquishment of custody to plaintiff was intended to be temporary or indefinite and whether she informed plaintiff and the child that the relinquishment of custody was temporary. This is an important factor to consider, for, if defendant had represented that plaintiff was the child's natural father and voluntarily had given him custody of the child for an indefinite period of time with no notice that such relinquishment of custody would be temporary, defendant would have not only created the family unit that plaintiff and the child have established, but also induced them to allow that family unit to flourish in a relationship of love and duty with no expectations that it would be terminated.

> However, if defendant and plaintiff agreed that plaintiff would have custody of the child only for a temporary period of time and defendant sought custody at the end of that period, she would still enjoy a constitutionally protected status absent other conduct inconsistent with that status.

> We wish to emphasize this point because we recognize that there are circumstances where the responsibility of a parent to act in the best interest of his or her child would require a temporary relinquishment of custody, such as under a foster-parent agreement or during a period of service in the military, a period of poor health, or a search for employment. However, to preserve the constitutional protection of parental interests in such

a situation, the parent should notify the custodian upon relin-
quishment of custody that the relinquishment is temporary, and
the parent should avoid conduct inconsistent with the pro-
tected parental interests. Such conduct would, of course, need
to be viewed on a case-by-case basis, but may include failure to
maintain personal contact with the child or failure to resume
custody when able.

*Id.* at 83-84, 484 S.E.2d at 537 (citation omitted).

In *Boseman v. Jarrell,* our Supreme Court discussed *Mason
v. Dwinnell,* 190 N.C. App. 209, 660 S.E.2d 58 (2008), a case which
relied upon *Price,* where the parent intentionally created a family unit
which included a nonparent:

In *Mason* the parties jointly decided to create a family and
intentionally took steps to identify the nonparent as a parent of
the child. These steps included using both parties' surnames to
derive the child's name, allowing the nonparent to participate
in the pregnancy and birth, and holding a baptismal ceremony
at which the nonparent was announced as a parent. After the
child's birth, the parties acted as a family unit. They shared
caretaking and financial responsibilities for the child. As a
result of the parties' creation, the nonparent became the only
other adult whom the child considers a parent.

The parent in that case also relinquished custody of the
minor child to the nonparent with no expectation that the non-
parent's relationship with the child would be terminated. The
parent chose to share her decision-making authority with the
nonparent. The parent also executed a Parenting Agreement
in which she agreed that the nonparent should participate in
making all major decisions regarding their child.

364 N.C. 537, 551, 704 S.E.2d 494, 503 (2010) (citations, quotation
marks, and brackets omitted). In *Boseman,* the Supreme Court went
on to consider whether the child's parent had lost her constitutionally
protected parental status by intentionally creating a family unit which
included another:

The record in the case *sub judice* indicates that defendant
intentionally and voluntarily created a family unit in which
plaintiff was intended to act-and acted-as a parent. The parties
jointly decided to bring a child into their relationship, worked
together to conceive a child, chose the child's first name to-

gether, and gave the child a last name that is a hyphenated name composed of both parties' last names. The parties also publicly held themselves out as the child's parents at a baptismal ceremony and to their respective families. The record also contains ample evidence that defendant allowed plaintiff and the minor child to develop a parental relationship. Defendant even agrees that plaintiff is and has been a good parent.

Moreover, the record indicates that defendant created no expectation that this family unit was only temporary. Most notably, defendant consented to the proceeding before the adoption court relating to her child. As defendant envisioned, the adoption would have resulted in her child having two legal parents, myself and plaintiff.

364 N.C. at 552, 704 S.E.2d at 504 (quotation marks and brackets omitted).

In *Rodriguez*, the paternal grandparents sought custody of their grandchildren after the death of the children's father and after the children were temporarily removed from the mother's custody by the Department of Social Services. ____ N.C. App. at ____, 710 S.E.2d at 237. In reversing the trial court's order granting visitation to the grandparents we noted,

Accordingly, relevant to the case-by-case determination to be made here are defendant's volitional acts involved in the placement of her children with DSS. In fact, the specific question to be answered in cases such as this one is: Did the legal parent act inconsistently with her fundamental right to custody, care, and control of her child and her right to make decisions concerning the care, custody, and control of that child? In answering this question, it is appropriate to consider the legal parent's intentions regarding the relationship between his or her child and the third party during the time that relationship was being formed and perpetuated.

Thus the court's focus must be on whether the legal parent has voluntarily chosen to create a family unit and to cede to the third party a sufficiently significant amount of parental responsibility and decision-making authority to create a permanent parent-like relationship with his or her child. The parent's intentions regarding that relationship are necessarily relevant to that inquiry. By looking at both the

> legal parent's conduct and his or her intentions, we ensure that the situation is not one in which the third party has assumed a parent-like status on his or her own without that being the goal of the legal parent.

> However, our Supreme Court has recognized that there are circumstances where the responsibility of a parent to act in the best interest of his or her child would require a temporary relinquishment of custody.

> Yet in this case, defendant did not voluntarily choose to cede any parental authority to another party; DSS filed a juvenile petition and removed the children from her custody.

*Id.* at ____, 710 S.E.2d at 242-44 (citations, quotation marks, ellipses, and brackets omitted).

E. Analysis

In this case also, we must consider "the legal parent's intentions regarding the relationship between his or her child and the third party during the time that relationship was being formed and perpetuated." *Id.* at ____, 710 S.E.2d at 242. The trial court here made findings of fact which demonstrate the intentions of the Father. The relationship with Grandmother, for purposes of this action, was formed when Father entered into the 2007 Custody Order which granted primary physical custody of Luke to Defendant, who "mainly resided" at Grandmother's home since 2004. The 2007 Custody Order specifically set forth that "family members" would assist with exchanges of Luke due to the parent's work schedules. The 2007 Custody Order very clearly granted custodial rights and decision-making authority to Father and Defendant only. Here, the primary family unit was clearly intended to be Father, Defendant, and Luke, with Grandmother as a part of the extended family, as any Grandmother would be a part of her grandchild's life. Thus, this case is entirely different from *Price* and *Boseman*, where one parent intentionally created a family unit which included a person who was not a biological parent of the child. *See Boseman*, 364 N.C. at 552, 704 S.E.2d at 504; *Price*, 346 N.C. at 83, 484 S.E.2d at 537. As Father here was merely following the 2007 Custody Order, we cannot determine that Father chose to create parental relationship between Grandmother and Luke.

Furthermore, as to the time Luke lived with Grandmother while Defendant was away from the home, we note that Grandmother primarily cared for Luke not through any voluntary act by Father, but

rather because, unbeknownst to Father, Defendant left Grandmother's home with the intent for Grandmother, not Father, to assume primary care of Luke. During this time, Father did not fail to maintain contact with Luke, but rather was involved in Luke's life to the full extent allowed by the 2007 Custody Order. As the trial court found, Father did not know that Defendant would be moving to Germany permanently until December 2009, and Defendant requested that Father allow Luke to remain with Grandmother, but Father "refused and informed the Defendant that if she was not going to be in Harnett County to care for the child he believed the child should be with him and not the Intervenor on a regular basis." Accordingly, Father did not voluntarily relinquish custody of Luke to Grandmother during the time that Defendant was gone. Instead, as soon as Father learned that Defendant would be permanently moving away from Grandmother's home, he stated his objection to having Luke remain with Grandmother.

In summary, this case falls squarely within the situation warned of by this Court in *Rodriguez*, which observed that "[b]y looking at both the legal parent's conduct and his or her intentions, we ensure that the situation is not one in which the third party has assumed a parent-like status on his or her own without that being the goal of the legal parent." *Rodriguez*, ____ N.C. App. at ____, 710 S.E.2d at 242. The findings of fact demonstrate that Father never intentionally chose to create a parental role for Grandmother, nor did he voluntarily relinquish primary custody of Luke to her; instead, Grandmother "assumed a parent-like status on . . . her own without that being the goal of" Father. *Id.* In such a case, we cannot conclude that Father acted inconsistently with his constitutionally protected paramount parental status.

### IV. Conclusion

As the trial court erroneously concluded that Father "acted inconsistently with [his] parental rights and responsibilities and [his] constitutionally protected status[,]" we reverse this conclusion of law and the trial court's order to the extent that it awards joint legal custody and primary physical custody to Grandmother. As Defendant did not appeal from this order, the trial court's conclusion that she "acted inconsistently with [her] parental rights and responsibilities and [her] constitutionally protected status[,]" is not affected by this opinion. Accordingly, we remand for entry of an order granting full legal and physical custody to Father and otherwise consistent with this opinion.

REVERSED and REMANDED.

Judges CALABRIA and McCULLOUGH concur.